**Rodney D. STEELE, Plaintiff,**

**v.**

**Frances P. STEELE, Executrix of the Estate of Byron W. Steele, Deceased, Defendant.**

**Civ. A. No. 916.**

United States District Court S. D. West Virginia, Bluefield Division.

Feb. 12, 1969.

Sidney J. Kwass, Kwass, Stone & Blue, Bluefield, W. Va., for plaintiff.

Paul S. Hudgins (Hudgins, Coulling & Brewster), Bluefield, W. Va., Ray Toler, Mullens, W. Va., for defendant.

CHRISTIE, District Judge:

Plaintiff instituted this suit seeking relief from an allegedly fraudulent transaction in which he sold undivided interests in several tracts of land to E. W. Hood and Ione Hood, which property was in turn transferred from the Hoods to Byron W. Steele and Marion C. Steele,

brothers of the plaintiff. Suit was originally instituted on September 10, 1965, against Marion and Byron Steele, however, plaintiff was unable to obtain service of process on Marion Steele and he was dropped as a party defendant. Upon the death of Byron W. Steele, his executrix, Frances P. Steele, was substituted as defendant. Jurisdiction is based upon diversity of citizenship and the requisite amount in controversy.

The case is presently before the Court upon submission by the parties for decision, and we shall accordingly base our findings of fact and conclusions of law upon the pleadings, depositions and certain deeds and leases filed and made a part of the record in this case by stipulation of the parties.

### FINDINGS OF FACT

S. M. Steele, father of the plaintiff and two original defendants, died intestate on August 10, 1924. He was survived by his wife and four sons, the fourth son being Leonard Steele who died in 1958. At the time of his death, S. M. Steele was seized of certain properties in and around Moundsville, West Virginia, which property, by virtue of the intestacy laws of West Virginia and the subsequent death of Steele's widow in 1943, vested in the four sons, each possessing a one-fourth undivided interest. On March 9, 1934, Leonard conveyed his interest in the property to the plaintiff, giving plaintiff, after the death of his mother in 1943, a one-half undivided interest in the property.

In early 1945, plaintiff wrote Marion Steele requesting him to determine whether or not the Moundsville properties could be sold.[1] It appears that at this time plaintiff was in need of money for the purpose of setting himself up in business in New Jersey, having only recently sold his business in North Carolina and moved north. After some investigation, Marion Steele secured two offers for the property, one for $8,000.00 and one for $9,000.00. The latter offer to purchase was made by E. W. Hood, Marion's brother-in-law. Having obtained the offer to purchase, Marion notified his brother, Byron, of the fact that Rodney wished to sell the property and that he had an offer of $9,000.00 from E. W. Hood. Byron agreed to sell his interest and Marion, accordingly, had deeds drawn transferring the interests of the brothers to E. W. Hood.[2]

Because there was some question as to the designation of the grantees in the deed (the question apparently relating to whether the grantee should merely be E. W. Hood or E. W. and Ione Hood), the deed dated March 19, 1945, was sent to Rodney with the names of the grantees left blank. At the same time $500.00 of the $1,000.00 down payment made by Hood was sent to Rodney. When no answer was received from Rodney, Marion called him and found that Rodney was refusing to sign the deed as long as the names of the grantees were left blank. Marion explained the reasons for not filling in the names and told Rodney that if he would send the deed back he would fill them in. Thereafter Rodney sent the deed back, Marion filled in the names of the grantees and Rodney signed the deed. Rodney's signature was acknowl-

1. Rodney Steele testified at the taking of his deposition that Marion had first contacted him about selling the property, however, in view of the admitted inquiry made by Rodney to his brother, Leonard, in early 1945 concerning the possibility of selling the property as well as Rodney's uncertain financial situation after the move to New Jersey, it would appear more likely that Rodney first contacted Marion concerning a possible sale of the Moundsville property.

2. While Marion testified that his cousin Wilbert instructed him to sign a deed and send it on to Byron, no such deed bearing the signatures of Marion and Byron and conveying their interests in the property to the Hoods has been submitted into evidence. Since neither the lawyer for the plaintiff nor the defendant questioned Marion further about such a deed, this Court is without knowledge as to whether the deed was ever drawn and signed by Marion and Byron.

edged before a notary public in New Jersey on March 21, 1945, and his wife's signature was acknowledged before a notary public in North Carolina on March 31, 1945.

Meanwhile, between the time the deed was drawn and the time it was signed by Rodney and his wife, a sale which E. W. Hood arranged with respect to his own property, failed to materialize and Hood was left without the necessary funds to purchase the Steele property. This situation was called to the attention of Wilbert K. Steele, a cousin of the Steele brothers and a real estate dealer who had managed the Moundsville property and acted as advisor to the brothers. Wilbert suggested to Marion that he (Marion) and Byron purchase the property. Marion was receptive to this suggestion and, after Byron indicated acceptance of this course of action to Wilbert, a deed was drawn, dated April 3, 1945, transferring the Hood's interest, which had been acquired from Rodney, to Byron and Marion. Thereafter, Rodney was sent the $4,000.00 still owing him on his share of the purchase price, however, the evidence does not show that he was ever informed that his brothers had purchased his one-half undivided interest from the Hoods.

At the time the sale was consummated between plaintiff and the Hoods and the Hoods and Marion and Rodney, the purchase price of $9,000.00 for the full interest closely approximated the actual value of the properties. Subsequent improvements to a building which was included in the sale, as well as a general rise in the value of real estate in the area, increased the value of the properties, but at the actual time of the transfer $9,000.00 was a reasonable price.

## CONCLUSIONS OF LAW

■ Jurisdiction in this case being based upon the diversity of citizenship of the parties, our decision must be determined by resort to the substantive law of the state of West Virginia, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

■ Fraud, such as charged by plaintiff in this case, may consist of either "actual fraud" or "constructive fraud." Actual fraud, as defined by the West Virginia courts consists of "deception, intentionally practiced, to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." Constructive fraud, on the other hand, has been defined as "a breach of legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence * * *. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." Miller v. Huntington & Ohio Bridge Co., 123 W.Va. 320, 15 S.E.2d 687 (1941).

■■ When a plaintiff contends that a party has practiced actual fraud with respect to a particular transaction, the burden is upon the plaintiff to establish the existence of fraud, Haudenschilt v. Haudenschilt, 129 W.Va. 92, 39 S.E.2d 328 (1946); Bennett v. Neff, 130 W.Va. 121, 42 S.E.2d 793 (1947), and the existence of such fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions. Flynn v. Yeager, 89 W.Va. 520, 109 S.E. 604 (1921). In sum, a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence. Hunt v. Hunt, 91 W. Va. 685, 114 S.E. 283 (1922).

■■ In the present case the evidence concerning the conduct of Byron Steele, as contrasted with the evidence relating to Marion Steele, fails to establish either that he himself acted dishonestly or that he was aware that others, supposedly acting in his behalf, were guilty of any dishonest intent. The evidence merely shows that he agreed to

purchase Hood's interest in the property when Hood, because of unexpected financial difficulties, became unable to carry out his obligations. Insofar as the evidence shows, Hood legitimately intended to purchase the property and had gone so far as to make a down payment. The price offered by Hood and ultimately paid to Rodney by Byron and Marion was a reasonable one in view of the conditions existing in the area at the time of the sale of the property. If indeed there was some scheme between Hood and Marion, something the evidence does not clearly demonstrate, it would require an extremely nebulous interpretation of the facts to impute such knowledge of fraud to Byron. The suggestion that Byron purchase Rodney's interest was made by Wilbert Steele and the idea was communicated to Byron by Wilbert rather than Marion. Under these circumsances, this Court will not impute fraudulent intent to Byron, who, it would appear in at least one respect, was attempting to accommodate Rodney's need for money. Nor can any supposed fraud on the part of Marion be imputed to Byron under an agency theory since, as disclosed by the facts, in purchasing the Hood's one-half undivided interest Byron was negotiating through Wilbert rather than Marion. Rather than a principal-agency relationship, Byron and Marion were acting independently and as equals in the purchase of property. The assertion that Marion was acting as an agent of Byron for the purpose of purchasing the interest of the Hoods in the property is simply not supported by the facts.

In the alternative, Rodney claims that a fiduciary relationship existed among the brothers as a result of their joint interests in the property, and that the failure to inform him of the fact that Byron and Marion had purchased his interest was a breach of this fiduciary relationship. Indeed, the single incriminating fact in the case, insofar as Byron is concerned, is the fact that he failed to inform Rodney that he had purchased the one-half undivided interest from E. W. Hood. If that information had been communicated to Rodney, much trouble and litigation probably would have been saved. Nevertheless, in view of the fact that the sale was made at the instigation of Rodney and in part to satisfy his present monetary needs, and the further fact that a reasonable price was paid for the property, the conscience of this Court is not stirred in Rodney's behalf. Technically, of course, at the time Byron made the purchase complained of, Hood rather than Rodney was a joint owner of the property. A deed had been drawn and signed by Rodney and his wife and part of the purchase price had been paid. If an unconscionable bargain had been made or some evidence had been offered showing improper conduct on the part of Byron, we might be more easily persuaded to look through the legal relationship of the parties at the time Byron and Marion purchased the one-half interest in the property from Hood, however, these circumstances have not been shown to exist in this case. We accordingly cannot find fraud, either actual or constructive, on the part of Byron Steele insofar as his dealings are concerned with respect to the transfer of the property from Rodney to the Hoods or from the Hoods to Byron and Marion.

Having reached the conclusion that no fraud, actual or constructive, was practiced upon the plaintiff and that there was no fiduciary relationship or breach thereof involved, we do not reach the defense of laches asserted by the defendant.

The foregoing shall constitute the findings and conclusions required by Rule 52(a) of the Federal Rules of Civil Procedure.