938 F.2d 474
 137 L.R.R.M. (BNA) 2916, 60 USLW 2140,
119 Lab.Cas. P 10,800,
6 Indiv.Empl.Rts.Cas. 1798
 Arthur Dale WHITE, James Anderson, James H. Baker, Thomas A.
Balon, Richard S. Barber, Larry G. Bell, David S. Bickler,
Robert L. Billick, Edward Bittner, Todd A. Blair, Richard
Blancato, Robert A. Bray, Jr., Harry V. Brown, Jr., James H.
Browning, James William Bullock, Charles A. Clark, Edward
Dhayer, Ralph Anthony Dibacco, William R. Duncan, Jr.,
Domenic F. Frio, Dorsey R. Garrett, William F. Garrison,
James A. Gracie, III, Thomas M. Grishkevich, David R.
Harbin, James W. Hazlett, Rena Hess, Phillip E. Johnson,
Jerry G. Jones, Robert L. Jones, Joseph P. Karas, Bartley
Robert Kirkbride, Lloyd A. Klages, David J. Kondik, Frank W.
Kruger, Jr., Charles L. Lacey, Timothy C. Lawson, Ernest H.
McCormick, Joseph W. Mayernick, Boley Dale Mermon, Patricia
Mlodzik, Charles D. Murray, Dale E. Poole, Charles Prince,
Larry C. Riggle, William B. Riggs, Robert J. Ryan, Jr., John
S. Sciance, Kenneth M. Seiple, John R. Selmon, Jr., Dennis
D. Shirer, Ronald L. Spring, Robert L. Sutton, Frederick C.
Tate, Stephen F. Tucker, Hoy L. Van Horn, Frederick R.
Welshans, Charles F. West, Donald L. White, John W.
Cominsky, Walter F. Mrozek, Dominic A. Tedeschi, Jr.,
Plaintiffs-Appellants,
v.
NATIONAL STEEL CORPORATION, Defendant-Appellee.
Arthur Dale WHITE, James Anderson, James H. Baker, Thomas A.
Balon, Richard S. Barber, Larry G. Bell, David S. Bickler,
Robert L. Billick, Edward Bittner, Todd A. Blair, Richard
Blancato, Robert A. Bray, Jr., Harry V. Brown, Jr., James H.
Browning, James William Bullock, Charles A. Clark, Edward
Dhayer, Ralph Anthony Dibacco, William R. Duncan, Jr.,
Domenic F. Frio, Dorsey R. Garrett, William F. Garrison,
James A. Gracie, III, Thomas M. Grishkevich, David R.
Harbin, James W. Hazlett, Rena Hess, Phillip E. Johnson,
Jerry G. Jones, Robert L. Jones, Joseph P. Karas, Bartley
Robert Kirkbride, Lloyd A. Klages, David J. Kondik, Frank W.
Kruger, Jr., Charles L. Lacey, Timothy C. Lawson, Ernest H.
McCormick, Joseph W. Mayernick, Boley Dale Mermon, Patricia
Mlodzik, Charles D. Murray, Dale E. Poole, Charles Prince,
Larry C. Riggle, William B. Riggs, Robert J. Ryan, Jr., John
S. Sciance, Kenneth M. Seiple, John R. Selmon, Jr., Dennis
D. Shirer, Ronald L. Spring, Robert L. Sutton, Frederick C.
Tate, Stephen F. Tucker, Hoy L. Van Horn, Frederick R.
Welshans, Charles F. West, Donald L. White, John W.
Cominsky, Walter F. Mrozek, Dominic A. Tedeschi, Jr.,
Plaintiffs-Appellees,
v.
NATIONAL STEEL CORPORATION, Defendant-Appellant.
 Nos. 90-3036, 90-3053.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1991.
Decided July 3, 1991.
 
 Carl H. Hellerstedt, Jr., argued, Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt (Carl Nicholas Frankovitch, John Archer McCreary, Jr., on brief), Pittsburgh, Pa., for plaintiff-appellant.
 Ronald George Backer, argued, Rothman, Gordon, Foreman & Groudine, P.C. (William P. Bresnahan, Henry C. Berns, on brief), Pittsburgh, Pa., for appellees.
 Before SPROUSE and WILKINSON, Circuit Judges, and ELLIS, District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 This case concerns the proper scope of federal and state regulation of employment relationships. The issues arise from layoffs of steel workers which occurred in 1982 at the Weirton Division of the National Steel Corporation in West Virginia. The plaintiffs are former union members who accepted management positions after National Steel allegedly made them promises of job security, including the right to return to their former positions in bargaining units. They maintain that their layoffs from salaried management positions constituted breaches of their individual employment contracts which are actionable under state law and that National Steel fraudulently induced them into accepting management positions.
 
 
 2
 National Steel responds that plaintiffs' claims are actually for breaches of collective bargaining agreements and must be pursued under Sec. 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185 or dismissed as preempted. Furthermore, National argues that subsequent changes in the governing collective bargaining agreements prohibited plaintiffs' returning to their former bargaining units and that the individual contracts must yield as preempted. We hold that plaintiffs' claims are primarily grounded in individual employment contracts and not in collective bargaining agreements. Although a subsequent collective bargaining agreement does preempt any specific performance of individual contracts that plaintiffs might seek, damages are still available under state law theories. We additionally hold that summary judgment should have been granted to National Steel on plaintiffs' state law claims for fraud, and remand for application of the proper evidentiary standard to plaintiffs' breach of contract claims.
 
 I.
 
 3
 Plaintiffs in this case are sixty-two employees of the Weirton Division of the National Steel Corporation who were laid off from their salaried management positions in 1982. Virtually every plaintiff was promoted to management from a job that was covered by a collective bargaining agreement. While the employees had accumulated seniority and thus some degree of job security in their former bargaining units, the management positions they accepted were not covered by collective bargaining agreements (i.e., were "exempt" positions) and did not generally provide for any job security.
 
 
 4
 The employees assert that they entered into oral employment contracts with National Steel which allowed them to retain their earned seniority in their new positions and provided them with the right to return to their former bargaining unit positions with their accumulated seniority intact should their management positions be terminated or should they otherwise wish to return. They claim that National Steel breached those contracts by failing to accord them promised seniority and by refusing to return them to their former positions. They also allege that National Steel fraudulently induced them to enter into their employment contracts and committed several other torts in discharging them.
 
 
 5
 The plaintiffs' claims can be divided into three general types: breach of contract, fraud, and other various torts. Only the contract and fraud claims are before us on appeal. We shall summarize in turn the specific claims in each type.
 
 
 6
 Plaintiffs' first four counts allege breach of contract. Counts One and Two contain the claims of forty-five former hourly rate workers who had all been members of the Production and Maintenance (P & M) bargaining unit of the Independent Steelworkers Union (union). As such, their terms of employment had been covered by a collective bargaining agreement which was periodically renegotiated between the union and National. Under the collective bargaining agreements that had been in effect until 1980, layoffs of hourly workers were determined primarily by "company seniority," or the length of time an employee had been with National Steel in any capacity. This provided workers who had uninterrupted company seniority some degree of job security. Exempt employees, however, were not covered by any collective agreement and thus enjoyed no such security.
 
 
 7
 National Steel had often promoted hourly rate employees to exempt management positions at times of increased business when it needed more foremen and managers. Because the company sometimes found it difficult to persuade hourly employees with seniority to accept often temporary management positions with no job security, it developed a flexible approach. When the workload declined, National often would return the recently promoted workers to their former positions in the bargaining unit with their accumulated seniority restored. Although the practice of returning management employees to the P & M bargaining unit was not prohibited by the collective bargaining agreement, it nevertheless caused unrest within the unit. Often when these employees returned, they displaced recently hired hourly employees who then would have to be laid off. As a result of the dissatisfaction engendered by this practice, the collective bargaining agreement that was installed on August 1, 1980 prohibited the return of a management employee to hourly employment if the return would result in hourly employees being laid off or if the reason for the supervisor's return was the elimination of the supervisory position. In addition, a returning employee would no longer be granted any company seniority credit for the time he spent outside the unit.
 
 
 8
 Count One contains the contract claims of forty-two former P & M employees who accepted management positions before the new collective agreement took effect on August 1, 1980. Count Two contains the contract claims of three plaintiffs who left the P & M unit after August 1, 1980. All forty-five assert that National Steel promised to use company seniority as the basis to determine layoffs from management and then breached its contracts by instead using "exempt seniority," or the tenure in only a management position, to calculate layoffs. The plaintiffs in Count One also assert that their management employment contracts with National Steel included the term that they would be able to return to their former P & M unit with full accumulated company seniority in the event they were laid off from management. Plaintiffs in Count Two, who left the P & M unit after the collective bargaining agreement placed limits on their ability to return, do not assert that National gave them such promises.
 
 
 9
 The second major group of plaintiffs, listed in Count Three, consists of fifteen employees who were promoted to exempt management jobs from salaried non-exempt (SNE) positions. Many of these positions were clerical. Prior to 1976, these employees had no written job protection. In 1976, National Steel published a Standard Practice Manual, which enumerated terms of employment for SNE positions. By 1979, these employees had designated the Independent Steelworkers Union as their bargaining representative and had negotiated a collective bargaining agreement that governed their employment. The collective agreements in both 1979 and 1980 provided that the seniority terms in the Standard Practice Manual would be in effect until a modifying agreement was adopted. Although the formal collective agreement was not modified until September 1983, National responded to union concerns in August 1982 by placing a hold on the return of supervisors to the SNE unit. Such returns had not been addressed in the earlier collective agreements.
 
 
 10
 Like the hourly rate employees in Count One, the former SNE employees claim in Count Three that National Steel promised them that they could return to their former unit positions with their seniority intact. They also assert that company seniority, and not exempt seniority, was to have been used to determine layoffs from management positions.
 
 
 11
 Finally, two plaintiffs began working in management positions directly rather than being hired from a bargaining unit. Their contract claims were brought in Count Four.
 
 
 12
 In the second major group of claims, plaintiffs maintain that National fraudulently induced them to leave their protected jobs by misrepresenting the terms of employment in exempt positions as well as its policies concerning employees' rights to return to their former units. Count Five contains allegations of fraud brought by both former P & M and former SNE employees. They maintain that although National assured them that they had the right to return to their units simply upon request, National's actual policy was that employees had no right to return but were transferred only with National's approval. Plaintiffs assert that because of that misrepresentation, they relinquished their protected positions. Had they instead remained in their units, they either would not have been laid off or they would have been recalled sooner. In addition to that assertion of actual fraud by misrepresentation, plaintiffs contend that National committed constructive fraud by failing to inform them of pertinent conditions of their employment.
 
 
 13
 Further fraud is alleged with respect to National's representation of how seniority would be used to determine management layoffs. Plaintiffs in Count Six allege that National stated that its policy was to use company time for calculating management layoffs, when in reality National's actual policy was to use criteria such as length of tenure in a management position, physical fitness, and importance of the job. Again, this misrepresentation purportedly led to plaintiffs' leaving their secure jobs in the bargaining units. Count Six, as well, encompasses claims of both actual and constructive fraud.
 
 
 14
 Counts Seven and Eight contain charges that National had a duty to notify former P & M employees of the change in the P & M collective agreement in 1980 that prohibited management returns to the unit, and to notify former SNE employees of the 1982 action prohibiting returns to the SNE unit. These failures to inform employees allegedly fall within the category of constructive fraud.
 
 
 15
 The remaining counts are not before us on appeal.
 
 
 16
 The district court conducted extensive hearings on the above claims before ruling on the parties' motions for summary judgment. A critical issue was whether Sec. 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. Sec. 185, which governs suits for breaches of collective bargaining agreements, preempted the state law contract and fraud claims. With regard to the Count One plaintiffs (former P & M hourly rate workers), the court held that Sec. 301 preempted their claimed rights to return to the P & M unit with accumulated seniority because the collective agreement in effect at the time of the layoffs prohibited their returns. The Count Three (former SNE workers) plaintiffs' similar claims of a right to return to the SNE unit were not preempted, however, because the collective agreement in effect at the time of the layoffs did not speak to their right to return. In reaching that conclusion, the court held that the actions in August 1982 did not amend the SNE collective agreement. None of the claims concerning National's policies for laying off exempt management employees were held preempted.
 
 
 17
 On the merits, the court held that the West Virginia statute of frauds did not foreclose plaintiffs' contract claims. Further, a plaintiff's individual claim survived National's motion for summary judgment if the plaintiff had produced sufficient proof that an oral contract of employment had been formed.
 
 
 18
 Turning to the fraud claims, the court concluded that "if a fraud claim has its source in a duty generated by a CBA [collective bargaining agreement], or if a court would have to analyze the provisions of a CBA to determine the existence of an element of a fraud claim, then the preemption doctrine applies." White v. National Steel Corp., 742 F.Supp. 312, 335 (N.D.W.Va.1989). The court then held that only Counts Seven and Eight--those based on an alleged duty to notify plaintiffs of a change in the collective agreements--were preempted. As for Counts Five and Six, plaintiffs' constructive fraud claims were dismissed based on both West Virginia law and a lack of evidence, but many of the actual fraud claims survived summary judgment.
 
 
 19
 The court entered judgment and certified its order for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b). National Steel timely petitioned this court for appeal, which we granted.
 
 II.
 
 20
 National asserts that most of plaintiffs' claims must be dismissed because they are preempted by Sec. 301 of the Labor-Management Relations Act of 1947 and because any claim arising under Sec. 301 was filed outside the alleged six-month filing period for such claims. Because many of the parties' arguments involve this issue and because the proper limits on judicial intervention into the collective bargaining process must be carefully maintained, we shall discuss the applicable preemption precedent before turning to the parties' claims. We conclude in this section that plaintiffs' contract claims are not preempted by Sec. 301. In Section III we determine that while other national labor law principles would prohibit specific performance of individual contracts in conflict with subsequent collective bargaining agreements, a prayer for damages for breach of contract is not foreclosed. In Sections IV and V we address the district court's disposition of the state law contract and fraud claims.
 
 A.
 
 21
 Section 301(a) of the Labor-Management Relations Act of 1947 provides that:
 
 
 22
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties...."
 
 
 23
 29 U.S.C. Sec. 185(a).
 
 
 24
 Although this provision appears to be simply a grant of jurisdiction to the federal courts, the Supreme Court explained in Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962), that "in enacting Sec. 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." The prospect that "individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." Id. at 103, 82 S.Ct. at 576. Thus, although state courts continue to have concurrent jurisdiction over breach of contract claims brought under Sec. 301, Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), they must apply federal law rather than state contract principles in interpreting the collective bargaining agreement and resolving the case. Lucas Flour, 369 U.S. at 102, 82 S.Ct. at 576. The preemptive effect of Sec. 301 is necessary "in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 404, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988).
 
 
 25
 While claims of breach of a collective bargaining agreement unquestionably arise under Sec. 301, some state tort claims are so intertwined with collective bargaining agreements that they must be considered preempted as well. In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), a union member who had filed a disability claim complained that his employer and insurance company continually refused to make timely payments to him. Under state law, however, the insurer's duties, including the alleged duty to make timely payments, had to be derived from the terms of the insurance contract itself. Because the insurance plan was incorporated into the collective bargaining agreement, it was "a question of federal contract interpretation whether there was an obligation under this labor contract to provide the payments in a timely manner," and the state tort claim was preempted by Sec. 301. Id. at 215, 105 S.Ct. at 1913. Lueck stands for the proposition that if a state law tort claim is founded on a duty that "is created by a collective-bargaining agreement and without existence independent of the agreement," then it is preempted by Sec. 301. See United Steelworkers of America v. Rawson, --- U.S. ----, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990); McCormick v. AT & T Technologies, Inc., 934 F.2d 531 (4th Cir.1991) (en banc).
 
 
 26
 Driving the Court's decision in Lueck was not only the need for uniformity of interpretation that was identified in Lucas Flour, but the need to preserve the central role of arbitration established in collective bargaining contracts. Lueck, for instance, had filed a tort claim of bad faith in state court instead of following the disability grievance procedure established in the bargaining agreement. The Court thus noted that "[p]erhaps the most harmful aspect of the [state court] decision is that it would allow essentially the same suit to be brought directly in state court without first exhausting the grievance procedures established in the bargaining agreement." Id. at 219, 105 S.Ct. at 1915. "Any other result [than preemption] would elevate form over substance and allow parties to evade the requirements of Sec. 301 by relabeling their contract claims as claims for tortious breach of contract." Id. at 211, 105 S.Ct. at 1911.
 
 
 27
 The Court made clear the limits of Lueck, however, when it held that an employee who was covered by a collective bargaining agreement that allowed discharge only for just cause could nevertheless file a state law tort claim for retaliatory discharge. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). In Lingle, the discharged worker pursued both litigation in state court and arbitration pursuant to the collective bargaining agreement. A unanimous Court held that the state law claim was not preempted because it did not turn on an interpretation of the collective bargaining agreement. "We agree ... that the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether Lingle was fired for just cause. But we disagree ... that such parallelism renders the state-law analysis dependent upon the contractual analysis." Id. at 408, 108 S.Ct. at 1882. To allow the state law claim to proceed was thus consistent with the policies promoted by Sec. 301 preemption. "[Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." Id. at 409, 108 S.Ct. at 1883. The Court emphasized in this respect that although Sec. 301 preemption was specific in scope, other national labor law principles could preempt state law claims that regulated subject matter reserved for federal law. Id. at 408-09 & n. 8, 108 S.Ct. at 1882-83 & n. 8.
 
 
 28
 The principles governing Sec. 301's effect on state law tort claims apply equally well to Sec. 301's effect on independent state law contract claims. In Caterpillar Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), a case with many similarities to the present one, an employer had promoted hourly workers who were covered by a collective bargaining agreement to salaried or managerial positions outside the bargaining unit. The employees alleged that although the company repeatedly promised them permanent employment, it later "temporarily" downgraded them to hourly positions in a bargaining unit and then laid them off. The employees filed claims in state court alleging breach of their independent employment contracts. The issue before the Court was whether Sec. 301 completely preempted the employees' state law claims.
 
 
 29
 Because the employees' claims were based on rights arising from independently negotiated individual employment contracts and not from a collective bargaining agreement, and because the complaint did not substantially depend on any interpretation of the collective bargaining agreement, the Court held that the claims did not arise from federal law. "Section 301 says nothing about the content or validity of individual employment contracts.... 'it would be inconsistent with congressional intent under [Sec. 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.' " Id. at 394-95, 107 S.Ct. at 2430-31 (quoting Lueck, 471 U.S. at 212, 105 S.Ct. at 1912). In so holding, the Court rejected the employer's argument that once the workers had rejoined the bargaining unit, their individual contracts were inevitably "subsumed into, or eliminated by" the collective bargaining agreement. Id. 482 U.S. at 396, 107 S.Ct. at 2431; see J.I. Case Co. v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). "[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement." Caterpillar, 482 U.S. at 396, 107 S.Ct. at 2431 (emphasis in original).
 
 B.
 
 30
 We think the plaintiffs' contract claims here are also independent of any collective bargaining agreement. The contract claims made by the plaintiffs in Count One (former P & M employees) and Count Three (former SNE employees) are similar. Plaintiffs in both counts allege that National promised them the right to return to their former positions with accumulated seniority and that National promised to use company seniority to calculate their job security rights in management positions. Plaintiffs in Count Two also maintain that company seniority should have been used for purposes of their management position security but they do not assert any right to return to their old positions.
 
 
 31
 Plaintiffs stress that their claims are not preempted under Sec. 301 of the LMRA because they depend on independent oral contracts of employment that do not rely on the terms of any collective bargaining agreement. National does not take issue with plaintiffs to the extent that the asserted contracts address conditions of employment in management positions, such as whether company or exempt seniority would be used to determine layoffs from management. National does argue, however, that plaintiffs' claims in Counts One and Three of a right to return to their former positions with company seniority intact are either actually founded in or "inextricably intertwined" with collective bargaining agreements and thus preempted by Sec. 301.
 
 
 32
 We do not find National's arguments persuasive. It is clear that plaintiffs are not relying on duties or promises contained in any collective bargaining agreements. They do not argue that when they accepted their management positions they had vested rights under the terms of their collective bargaining agreements that were immune from change in a subsequent agreement. See, e.g., Holland v. National Steel Corp., 791 F.2d 1132, 1134 (4th Cir.1986) (basis of right to return was former collective agreement). The promises plaintiffs seek to enforce are those that National made to them in negotiations over the terms of employment in management positions. "Nothing in the LMRA prevents an individual--whether that individual is to be newly hired or promoted from a bargaining unit--from negotiating an employment contract for a management position." Malia v. RCA Corp., 794 F.2d 909, 913 (3d Cir.1986). Plaintiffs' individual employment contracts are the foundation of their asserted rights, including the right to have company rather than exempt seniority used as a criterion for layoffs from management, as well as the right to return to their bargaining units with accumulated company seniority. "Section 301 says nothing about the content or validity of individual employment contracts." Caterpillar, 482 U.S. at 394, 107 S.Ct. at 2430. It is those contracts, not the collective bargaining agreements, that must be interpreted.
 
 
 33
 The arguments here all hinge upon state law. To establish their claims, plaintiffs must satisfy the West Virginia requirements for proof of an oral employment contract and show that National breached the contract. National's defenses are that it did not make such promises, that any statements it made did not rise to the level of an independent employment contract, and that the asserted contracts are barred by the statute of frauds. The promises are not based in a collective bargaining agreement, however, nor must a fact-finder interpret any provisions of a collective agreement in order to determine these issues. Plaintiffs' asserted rights, therefore, are not preempted by Sec. 301. See Lingle, 486 U.S. at 407, 105 S.Ct. at 1882; Caterpillar, 482 U.S. at 395, 107 S.Ct. at 2431; Berda v. CBS Inc., 881 F.2d 20, 25-26 (3d Cir.1989); Degan v. Ford Motor Co., 869 F.2d 889, 892 (5th Cir.1989); Anderson v. Ford Motor Co., 803 F.2d 953, 958-59 (8th Cir.1986). But see Ulrich v. Goodyear Tire & Rubber Co., 884 F.2d 936, 937-38 (6th Cir.1989).
 
 
 34
 This is not a situation such as that presented by Lueck or International Brotherhood of Elec. Workers v. Hechler, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987). In those cases, the state law inquiry into whether the defendant's conduct was negligent or wrongful required that collective bargaining agreements be referenced. In Lueck, any duty to provide timely disability payments arose from the collective agreement. In Hechler, any duty of the union to provide a union member with a safe workplace turned on the obligations the union had accepted under the collective agreement. Here, the duties National allegedly assumed are defined by the terms of individual employment contracts and not by a collective agreement.
 
 
 35
 Our conclusion that plaintiffs' claims are not preempted by Sec. 301 is buttressed by the aforementioned policies underlying its preemptive capacities. First, because the alleged duties arise from independent contracts, no danger of inconsistent interpretations of terms of a collective bargaining agreement is presented. Second, there is no danger of circumventing commitments to arbitration in this case. Plaintiffs were not in positions covered by a collective agreement, nor has National asserted that plaintiffs were still represented by the union, see, e.g., Darden v. United States Steel Corp., 830 F.2d 1116, 1119-20 (11th Cir.1987), or that they should have first resorted to arbitration of their dispute. See Ulrich, 884 F.2d at 937 (noting lower court's holding that union had no duty to represent former bargaining unit employees who had transferred outside the unit). To the extent that National's preemption arguments are based on policies besides these, they raise different preemption issues that we address in the next section. "[S]ection 301 preemption is not the only, or even the primary, tool available for promoting industrial peace." Berda, 881 F.2d at 27. Section 301 does not foreclose, however, plaintiffs' pursuit of rights that are grounded in an independent contract and not in a collective agreement.
 
 III.
 
 36
 The fact that Sec. 301 of the LMRA does not preempt plaintiffs' state law contract claims cannot end our inquiry. That the employees' claims existed apart from Sec. 301 does not foreclose the possibility that they might be preempted under other principles of federal labor law. Caterpillar, 482 U.S. at 397-99, 107 S.Ct. at 2432-33. Whereas Sec. 301 preemption addresses the need for federal law to control interpretation of collective bargaining agreements, more general principles of preemption in the area of labor law speak to the supremacy of the bargaining agreements themselves in the face of inconsistent workplace understandings. National thus urges that plaintiffs' claims are preempted because the contracts relate to conditions of employment for a position within a bargaining unit and therefore cannot be inconsistent with the governing collective bargaining agreements. Although a subsequent change in a collective agreement may indeed foreclose specific performance of the individual contracts, we hold that plaintiffs can nevertheless pursue damages remedies consistent with federal labor law.
 
 
 37
 Specifically, National asserts that those terms of the alleged independent contracts which address jobs covered by a collective bargaining agreement can be effective only as part of the collective bargaining agreement. See J.I. Case Co. v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944); Ulrich v. Goodyear Tire & Rubber Co., 884 F.2d 936, 938 (6th Cir.1989); Darden v. United States Steel Corp., 830 F.2d 1116, 1120 (11th Cir.1987); Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 997 (9th Cir.1987); Eitmann v. New Orleans Pub. Serv., Inc., 730 F.2d 359, 362-64 (5th Cir.1984). The company maintains that if the subject matter of a contract is a position in the collective bargaining unit, then the contract cannot contain terms that are inconsistent with those contained in the collective bargaining agreement. National impresses upon the court the threat to labor peace that would result if members of a bargaining unit were able to enforce under state law an individual contract which promised rights either granted or foreclosed by a collective bargaining agreement. "State law does not exist as an independent source of private rights to enforce collective bargaining contracts." Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists and Aerospace Workers, 376 F.2d 337, 340 (6th Cir.1967), aff'd, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). Thus, National would have us declare plaintiffs' individual contracts null and void as a result of the subsequent bargaining agreements that limited their right to return to the unit.
 
 
 38
 National's arguments are founded on strong principles of federal labor law but do not lead to the result it desires. To begin with, National's primary reliance on J.I. Case is misplaced. For one thing, the setting of that case and this one are quite different. Here there is no threat that the collective bargaining process will be broken off by the presence of the individual contracts. In J.I. Case, by contrast, the employer attempted to use prior legal commitments in individual contracts as a shield to escape its duty to bargain collectively with the union. The Court not surprisingly held that the company's state law contractual obligations could not trump its federal law duty to bargain and that whatever terms were adopted in the collective bargaining agreement would have to take precedence over inconsistent terms in individual contracts.
 
 
 39
 The Court in Case did not proscribe individual contracts, however, but declared that they "cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by appropriate forums under the laws of contracts applicable, and to the Labor Board if they constitute unfair labor practices." 321 U.S. at 339, 64 S.Ct. at 581. "We know of nothing," said the Court, "to prevent the employee's, because he is an employee, making any contract provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice." Id. Further, the Court noted that any "discontinuance of the contract is without prejudice to the assertion of any legal rights the employee may have acquired under such contract." Id. at 342, 64 S.Ct. at 582. Finally, in Caterpillar, the Court relied upon J.I. Case when declaring that the employer's "basic error is its failure to recognize that a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement." 482 U.S. at 396, 107 S.Ct. at 2431 (emphasis in original).
 
 
 40
 The significance of the above language seems clear. Employees who have made valid individual contracts that conflict with subsequent federal labor agreements, and thus cannot be specifically enforced, are still free to bring damages claims against their employer for breach of contract. See Belknap, Inc. v. Hale, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983). In Belknap, a seller of building materials and hardware promised permanent employment to workers who were willing to replace striking warehouse and maintenance employees. The employer eventually reached a settlement with the union under which the strikers were recalled. As a result of the recalls, the replacement workers who had been promised permanent positions were laid off. Those displaced workers brought suit against the employer in state court for fraudulent misrepresentation and for breach of contract.
 
 
 41
 The Court termed "mystifying ... the suggestion that the federal law shields the employer from damages suits for misrepresentations that are made during the process of securing permanent replacements and are actionable under state law." Id. at 500, 103 S.Ct. at 3177. The Court observed that although J.I. Case indicated "that individual contracts of employment must give way to otherwise valid provisions of the collective-bargaining contract," the argument "that the contracts are not only not specifically enforceable but also may be breached free from liability for damages ... was rejected in J.I. Case." Id. at 506, 507, 103 S.Ct. at 3180, 3181. The Court also rejected the argument that allowing suits for damages would interfere with the federal policy of promoting settlement of labor disputes: "[t]his is just another way of asserting that the employer need not answer for its repeated assurances of permanent employment or for its otherwise actionable misrepresentations...." Id. at 501, 103 S.Ct. at 3178. Indeed, it seems wrongful in an elemental sense for an employer to secure an employee's performance of a contractual bargain and then to escape via preemption any liability for breach of that same contract.
 
 
 42
 We do not understand National to argue that plaintiffs' individual contracts, when allegedly negotiated, conflicted with the terms of the applicable collective agreements. Its argument therefore depends on the effects that the subsequent collective agreements have on the individual contracts. In this connection, none of the cases National cites addresses the effect of a subsequent change in a collective agreement on a contract claim that is not preempted by Sec. 301. See Ulrich, 884 F.2d 936; Darden, 830 F.2d 1116; Young, 830 F.2d at 996 (alleged contract was inconsistent with the terms of the collective agreement at the time it was made); Eitmann, 730 F.2d at 361, 364 (discharged lineman in a bargaining unit sought reinstatement rather than damages, and was attempting to bypass grievance procedures in the collective bargaining agreement).
 
 
 43
 To allow plaintiffs to proceed with their breach of contract claims for damages will not compromise any principles of federal labor law. Plaintiffs do not seek reinstatement in the units, nor could state law provide such a remedy if the applicable collective agreements prohibited it. Thus the bargains struck by National and the unions to resolve the issue of exempt employee returns remain intact and immune from judicial intervention. Nor will labor peace be disturbed here by union members who seek to individually contract out of the terms of their governing collective agreements. See, e.g., DeLapp v. Continental Can Co., 868 F.2d 1073 (9th Cir.1989) (alleged promise that employer would not enforce a disqualification provision in collective agreement held preempted). At the time plaintiffs' alleged contracts were made, they were apart from and not in conflict with the collective agreements in force. The federal policy of promoting arbitration of labor disputes is also not threatened as plaintiffs are not seeking state law enforcement of rights that are guaranteed under a collective bargaining agreement.[1]
 
 
 44
 National asserts finally that the union was willing to strike over management returns to bargaining units and that in the interest of preserving peace within the labor force it had no choice but to prohibit further returns. It may be true that National faced a dilemma. If so, however, it was a dilemma of National's own making, by voluntarily committing itself contractually to conflicting duties. See W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers of Am., 461 U.S. 757, 767, 103 S.Ct. 2177, 2184, 76 L.Ed.2d 298 (1983) (company that signed Title VII conciliation agreement that conflicted with seniority provisions of collective bargaining agreement was held to terms of both). National did not have to encourage its employees to leave their bargaining units or guarantee plaintiffs the rights it allegedly did. It did so, however, in an effort to bolster its managerial team. It should not now be heard to complain that it has the responsibility of making good upon valid contractual commitments. Although no state law remedy may be awarded in violation of a collective bargaining agreement, we do not believe that federal law shields an employer who lures workers out of their secure positions and then strikes a deal with their former union behind their backs.
 
 
 45
 We now turn to address the breach of contract claims on the merits.[2]
 
 IV.
 
 46
 National asserts that plaintiffs' oral contract claims cannot survive the West Virginia statute of frauds. We conclude that the statute of frauds does not bar the claims. Because the district court applied a less rigorous evidentiary standard than we believe West Virginia law requires to survive summary judgment, however, we remand these claims for application of the proper standard.
 
 A.
 
 47
 The West Virginia statute of frauds provides that:
 
 
 48
 No action shall be brought in any of the following cases: ...
 
 
 49
 (f) Upon any agreement that is not to be performed within a year;
 
 
 50
 Unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent.
 
 
 51
 W.Va.Code Sec. 55-1-1 (1981). An oral contract that can be performed according to its terms within a year does not fall within this provision. "[I]t is only necessary that the contract be capable, by reasonable construction, of full performance by one side within a year in order to remove it from the statute of frauds." Thompson v. Stuckey, 171 W.Va. 483, 300 S.E.2d 295, 298 (1983). In Stuckey, the oral employment contract was for an indefinite period of time but contained a provision for a closing bonus in the event the worksite was sold and the job ended. The Supreme Court of Appeals of West Virginia held that even though "the parties did not contemplate that the contract was to be performed within one year, and ... it was not in fact performed within one year," the statute of frauds did not apply because the contract arguably could have been completely performed within a year in the event the worksite had been sold. Id. 300 S.E.2d at 297-98.
 
 
 52
 Here, the alleged contracts are also of indefinite duration and performance by plaintiffs in some cases may have extended beyond a year. Yet National Steel could have fully performed the contracts within a year of their formation if the plaintiffs had requested a return to their units during that period of time. Stuckey thus leads to the conclusion that the West Virginia statute of frauds does not bar plaintiffs' claims. National's attempts to characterize plaintiffs' requested returns as "non-performance" and its citation of cases from other states are simply not persuasive when West Virginia courts have spoken so clearly to this very point.
 
 
 53
 Although the statute of frauds does not stand as an absolute bar to plaintiffs' claims, neither does it leave defenseless those against whom oral contracts are being alleged. In order to avoid allowing "plaintiffs with insubstantial evidence to take unreliable claims before a jury," West Virginia does require "clear and convincing evidence" that an oral contract exists if it was not in fact performed within one year. Id. at 299. "[T]he oral testimony of the beneficiary alone is a slender reed upon which to support a judgment...." Id. at 298. Additional proof "may include circumstantial evidence, apparent reliance, similar practices of the defendant in particular or of the industry in general in similar situations, or anything else that will convince the court that the defendant has been protected from an utterly spurious claim." Id. at 299.
 
 B.
 
 54
 The more rigorous evidentiary standard required to establish genuine oral contracts must be applied here in light of another important state interest. West Virginia follows the doctrine of "at will" employment under which either party can terminate an employment relationship at any time, with or without cause. See Bell v. South Penn Natural Gas Co., 135 W.Va. 25, 62 S.E.2d 285, 288 (1950). Employment that is for no fixed term is considered terminable at will. Harless v. First Nat'l Bank, 162 W.Va. 116, 246 S.E.2d 270, 273 (1978).
 
 
 55
 Parties can contractually alter the at will status of an employment relationship. Cook v. Heck's Inc., 342 S.E.2d 453, 457 (W.Va.1986). However, "because [West Virginia] operate[s] on the [presumption] that every employment relation is terminable at will, any promises alleged to alter that presumptive relationship must be very definite to be enforceable." Suter v. Harsco Corp., 403 S.E.2d 751, 754 (W.Va.1991) (emphasis in original). In Heck's, the Supreme Court of Appeals of West Virginia applied "settled principles of contract law" in holding that an employee handbook that contained a promise of job security could constitute a unilateral contract. Id. at 459. However, before a personnel manual can constitute a potentially binding offer, it must contain "a definite promise therein by the employer not to discharge covered employees except for specified reasons." Id. The manual at issue in Heck's contained a "complete" list of rules whose violations were grounds for discharge. That the list purported to be complete was essential to the plaintiff's claim, for " '[n]o unilateral contract arises merely by the fact that [the employer] has alerted its employees that certain conduct may form the basis of a discharge.' " Id. (quoting Ruch v. Strawbridge & Clothier, Inc., 567 F.Supp. 1078, 1081 (E.D.Pa.1983)). National thus urges that Heck's and Suter require great specificity of the alleged contract terms. Plaintiffs respond that under West Virginia law no higher specificity of terms is needed here than for any other contract; only "reasonable certainty" is required. See 4B Michie's Jurisprudence of Virginia and West Virginia, Contracts Sec. 27 (1986). Plaintiffs also maintain that any ambiguity in the contract can be resolved by an examination of the totality of the circumstances. See id.
 
 
 56
 Plaintiffs' arguments pass over the two distinguishing features of their alleged contracts, however. Not only do Heck's and Suter require a definite and specific promise to alter an employee's at will status, such as the terms by which an employee will be laid off, but Stuckey requires clear and convincing evidence of the oral contract.
 
 
 57
 In combination, these cases establish an exacting evidentiary standard for the alleged oral contracts to meet.
 
 C.
 
 58
 With respect to the provision that National would lay off management workers in accordance with company seniority, plaintiffs argue for both express contracts and contracts implied from National's past practices. The district court dismissed these implied contract claims. Upon reviewing the evidence of National's past practices of laying off exempt employees, the district court found no consistent policy. While company time "was probably the major factor in determining layoffs since 1977, ... there seems to have been disagreement within management about that criteria, and performance generally seems to have been a factor." 742 F.Supp. at 333. We have no reason to dispute the district court's finding. We also agree with that court's reluctance to imply any contract terms based on National's past practices alone as a matter of West Virginia law. Heck's involved a written manual that met traditional elements of contract formation because its contents were definable, it was generated by the employer, and it could manifest an offer given at a specific time. By contrast, a past practice cannot alone be considered an offer made at a specific time that is accepted by continued work, and the "contents" of the past practice here are indefinite and imprecise. We see no clear point at which a past practice would become so firm and definite as to constitute an offer, nor do we see any indication that West Virginia courts would consider it thus. Therefore we affirm the district court's dismissal of these implied contract claims.
 
 
 59
 Plaintiffs also argue that they were expressly promised that layoffs would be based on company seniority or that company seniority would continue. The meaning of those promises, however, appears to be anything but clear. The gloss that plaintiffs would impart to those promises is expansive: for example, a foreman in the Construction Division with seniority would be able to displace a less senior employee in the Operations Division; Operations foremen could shift to other positions in Operations; employees in exempt Staff positions could move to other Staff positions or to Operations. In order to prove such terms, however, evidence of such specificity on the part of National must be adduced.
 
 
 60
 In the district court, any plaintiff's claim that included the mere mention of "company seniority" survived National's motion for summary judgment. In light of the precise definition that Heck's and Suter require before finding modification of at will employment, and in light of the clear and convincing evidence of oral contracts that Stuckey requires in order to discourage spurious or perjured claims, we believe such a lenient standard is in error. We therefore remand these contract claims in order to allow the district court to apply an evidentiary standard that is more in keeping with the principles we have discussed above.
 
 
 61
 With respect to plaintiffs' alleged rights to return to their former positions within bargaining units, plaintiffs again argue the existence of express contracts and contracts implied from National's past practices. We affirm the district court's dismissal of the implied contract claims for the reasons previously discussed. As for the express contract claims, they must be evaluated in light of the evidentiary standards described above. Evidence in addition to plaintiffs' mere allegations may be relevant to the contracts here. For example, the Acting Director of Management Planning wrote in April 1982 that "[a]lthough many of the reduced employees were guaranteed a return to the bargaining unit (if necessary or requested) by management when they were promoted, the current circumstances do not permit such transactions per the 1980 [P & M] contract." While such general statements may be relevant, an individual plaintiff must prove, of course, that he was particularly promised a right to return to his former unit. Because we are doubtful that the district court applied the proper evidentiary standard to these claims, we remand these counts as well.
 
 V.
 
 62
 Plaintiffs have also alleged that National Steel committed numerous counts of fraud, both constructive and actual. We shall discuss the constructive fraud counts first.
 
 A.
 
 63
 Counts Five through Eight all contain allegations of constructive fraud. The district court properly dismissed these claims.[3]
 
 
 64
 Constructive fraud "is a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." Stanley v. Sewell Coal Co., 169 W.Va. 72, 285 S.E.2d 679, 683 (1981). According to plaintiffs, National committed constructive fraud by failing to inform them of various material facts affecting their employment, including National's policy toward management reductions (Count Five), its general layoff policies and criteria for management employees (Count Six), and its subsequent changes of policy (Counts Seven and Eight). Plaintiffs urge that National's duty to disclose this information arose because National was "aware of ... conditions which substantially affect[ed]" the plaintiffs' decisions to accept management positions, while plaintiffs were unaware of those conditions and would not have discovered them in making a "reasonably diligent inspection." See Chamberlaine & Flowers, Inc. v. McBee, 356 S.E.2d 626, 629 (W.Va.1987); Thacker v. Tyree, 171 W.Va. 110, 297 S.E.2d 885, 888 (1982).
 
 
 65
 We do not find plaintiffs' arguments persuasive. The cases they cite establish claims for constructive fraud in the context of property sales. See also Frazer v. Brewer, 52 W.Va. 306, 43 S.E. 110 (1903) (fraud by nondisclosure in sale of corporate stock). In addition, constructive fraud is generally reserved for those cases where a fiduciary relationship exists between the parties or the fraud violates an important public policy concern. See Miller v. Huntington & Ohio Bridge Co., 123 W.Va. 320, 15 S.E.2d 687, 695 (1941). Plaintiffs have not shown that either of those situations pertains here, nor do the facts show behavior so arbitrary and irresponsible as to be egregious. See Broussard v. CACI, Inc.-Federal, 780 F.2d 162, 164 (1st Cir.1986) (no fraudulent concealment in employer's failure to disclose details of at will policy).
 
 
 66
 Finally, any court-imposed affirmative duty to inform employees of conditions of employment, particularly layoff policies and criteria, may lead to diminution of West Virginia's at will doctrine. Employees could easily argue that disclosure of employment policies gives rise to binding oral contracts that the employer will use those terms. We see no indication that West Virginia would have us adopt a legal doctrine developed in the context of commercial sales and apply it within employment relationships in such a way that non-disclosure on the part of an employer operates as constructive fraud and disclosure operates as a binding unilateral contract. The constructive fraud claims in Counts Five through Eight were therefore properly dismissed.
 
 B.
 
 67
 In contrast to the constructive fraud claims of omission, the actual fraud claims remaining in Counts Five and Six assert that National actively misrepresented its policies and the conditions of employment for management positions.
 
 
 68
 In West Virginia, the elements of a claim of fraudulent inducement of a contract are that: the allegedly fraudulent act was committed by the defendant; the act was material and false; the plaintiff justifiably relied upon the act; and the plaintiff was damaged because he relied upon it. Lengyel v. Lint, 167 W.Va. 272, 280 S.E.2d 66, 69 (1981). Plaintiffs' theory in Count Five is that: National told them that they had the unilateral right to return to their former positions at any time they chose to do so; the company's statement was false when made because National's actual policy was that National, rather than plaintiffs, decided who could return; they justifiably relied upon that representation when deciding to accept the salaried management positions; and they were damaged when they left their secure jobs in the bargaining units. Count Six similarly involves alleged misrepresentations of National's criteria and policies for determining layoffs from management.
 
 
 69
 Plaintiffs have thus attempted to tailor their claims to the elements of fraud. We must be careful to distinguish between actual fraud and artfully pleaded breach of contract claims, however. "[F]raud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events...." Janssen v. Carolina Lumber Co., 137 W.Va. 561, 73 S.E.2d 12, 17 (1952) (quoting 37 C.J.S. Fraud Sec. 11). In addition, plaintiffs carry an "unquestionably heavy" burden of proof. Tri-State Asphalt Products, Inc. v. McDonough Co., 391 S.E.2d 907, 912 (W.Va.1990). "[T]he existence of [actual] fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions. In sum, a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence." Steele v. Steele, 295 F.Supp. 1266, 1269 (S.D.W.Va.1969) (citation omitted).
 
 
 70
 Plaintiffs here simply have not shown the level of proof necessary to reach a jury with their fraud claims. Whatever misunderstandings occurred over the terms of employment fall well short of the clear and convincing evidence needed to prove that National was embarked upon an enterprise of fraud. The primary problem is the generality and vagueness of the alleged representations. To succeed under the fraud theory in Count Five, plaintiffs would have to show that National represented to them that they had the unilateral right to return to their former positions when, in fact, National at that time reserved that power for itself. An affirmative answer to an employee's question, "can I return if I don't like the job?," for example, will not suffice in this regard. In the first place, such an exchange is much more in the nature of a promise to return a worker than it is a misrepresentation of which party has the final authority over the decision. The parties are focused on the future and not on descriptions of present or past facts. National might well have intended to return plaintiffs upon an expression of displeasure but later changed its mind. Broken promises are the substance of contract law and are not to be shoehorned into an ill-fitting suit of fraud.
 
 
 71
 Secondly, even if plaintiffs made such a showing, those statements that might be construed to concern a misrepresentation of policy can as easily be construed to constitute waivers of National's asserted right to make the final reduction decisions. Upon reviewing National's past return practices, the district court was unable to determine whether the locus of decision resided with National or with the employees. Even accepting as true that National's actual policy was that it "retained the discretion to grant or deny such a request by virtue of its inherent authority to manage the workforce," a specific representation that an employee had the right to return at his option can be viewed as a waiver of National's inherent authority just as easily as it can seem a misrepresentation of a policy. Fraud "is not deducible from facts and circumstances which would be equally consistent with honest intentions." Steele, 295 F.Supp. at 1269.
 
 
 72
 Thus, plaintiffs cannot succeed on their claims of actual fraud in Count Five. If National did make promises that employees had the unilateral right to return to their bargaining units, any claims based on those promises must be pursued as breaches of contract and not as fraud.
 
 
 73
 We reach a similar conclusion with regard to Count Six. The three express misrepresentations alleged in Count Six are that: 1) National would transfer rather than lay off exempt employees; 2) there would be no layoffs of exempt employees; 3) layoffs would be based on company seniority. All of these allegations are promises made by National and therefore not actionable as fraud. Janssen, 73 S.E.2d at 17. Only if National knew at the time it made the statements that they were false, e.g., National was simultaneously making specific plans to lay off the very employees it was promising not to layoff, would plaintiffs state a claim for fraud. See, e.g., Varnum v. Nu-Car Carriers, Inc., 804 F.2d 638, 641 (11th Cir.1986). This showing they have not made. Although plaintiffs produced evidence that by 1979 National had begun developing guidelines for management layoffs, the district court concluded that "plaintiffs have not supplied or proffered any evidence in this voluminous record to indicate what National's specific plans for layoffs were in the years 1979-81." 742 F.Supp. at 341. The court observed further that "the turmoil in the United States steel industry was widely known in the late 1970s and general preparations in those years for the possibility of layoffs should hardly have come as a surprise to employees at a steel plant." Id. Finally, as mentioned earlier, the court's review of National's past practices revealed that company time had indeed played a major role in determining management layoffs in the late 1970s. Plaintiffs have made no showing of any misrepresentations that would support their claims of actual fraud in Count Six and therefore these claims are properly dismissed.
 
 VI.
 
 74
 The parties have asserted other points of error. Plaintiffs take issue with the district court's ruling that National cannot be liable for any damages that occurred after the date of the sale of National's Weirton Division in 1984 to Weirton Steel Corporation, and with the court's dismissal of the claims in Count Four. National asserts that the district court erred by allowing plaintiffs to pursue both fraud and contract claims. We find no merit in any of these contentions and affirm the district court's disposition of them.VII.
 
 
 75
 Plaintiffs here left protected jobs in their bargaining units after allegedly obtaining promises from National that they would have job security in their new management positions. After plaintiffs assumed their new posts, National and the unions changed collective bargaining agreements to prohibit plaintiffs' return to their former positions. Those subsequent changes in the collective bargaining agreements were in direct conflict with the promises that plaintiffs have alleged National made to them.
 
 
 76
 Federal law has established a broad framework for resolving disputes between employers and organizations representing groups of employees. Our decision in this case has been careful to respect that framework and the primacy of federal law in this area. After examining the history and policies underlying Sec. 301 of the Labor-Management Relations Act, we conclude that Sec. 301 does not preempt plaintiffs' state law claims that are based on individually negotiated employment contracts rather than on collective bargaining agreements. Other federal preemption principles require that the terms of applicable collective bargaining agreements take precedence over inconsistent terms in individual contracts and thus foreclose any demands for specific performance of state law contracts. However, plaintiffs here can maintain actions for damages without compromising any national labor concerns. In these specific circumstances, federal law does not act as a shield to allow an employer to escape liability in damages for otherwise binding promises it makes to employees.
 
 
 77
 On the merits of the contract counts, the district court properly dismissed claims of implied contracts grounded in past practices. The contract claims based on express promises we remand to the district court for application of the proper evidentiary standard. We further remand with directions to dismiss the allegations of constructive and actual fraud. The judgment of the district court is
 
 
 78
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 National has also not argued that these claims should be foreclosed because they interfere with the primary jurisdiction of the NLRB or because Congress has intended this area to remain unregulated. See San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)
 
 
 [2]
 Because we hold that a subsequent collective bargaining agreement is no defense to an action for damages for breach of a prior valid contract, we need not determine whether the events in August 1982 constituted an amendment to the SNE collective agreement
 
 
 [3]
 Because, as we discuss below, the fraud claims involve in the main artfully pleaded breach of contract claims and relate in significant part to contract formation, we think the foregoing conclusion of non-preemption with respect to the contract claims applies to the fraud claims as well