Jeanne **BIRCH**, Plaintiff

v.

**THE PEPSI BOTTLING GROUP, INC.**, Defendant

**Civil No. AMD 02–308.**

United States District Court, D. Maryland.

May 2, 2002.

Beth Pepper, Law Office, Baltimore, MD, for plaintiff.

Henry Morris, Jr., Anne M. Hamilton, Savalle C. Sims, Arent Fox Kintner Plotkin and Kahn PLLC, Washington, DC, for defendant.

## MEMORANDUM

DAVIS, District Judge.

This case involves claims of disability discrimination and breach of contract and is here on the basis of federal question jurisdiction, Jeanne Birch ("plaintiff" or "Birch") has brought this case against her former employer, The Pepsi Bottling Group, Inc. ("Pepsi" or "defendant"), alleging violations of the American with Disabilities Act, 42 U.S.C. § 12112(a) and (b), breach of an implied contractual duty not to imperil the employee, and breach of contract. Now pending is defendant's motion to dismiss or in the alternative, for summary judgment. No scheduling order has issued and no discovery has been taken, but the parties have filed comprehensive memoranda, accompanied by relevant exhibits; no hearing is needed. *Local R.* 105.6. For the following reasons, defendant's motion shall be granted in part and denied in part.

(i)

In the present case, the motion to dismiss is treated as one for summary judgment as documents outside the pleadings are included in the record. *See* FED. R. CIV. PROC. 12(c); *Crowley v. Fox Broadcasting Co.*, 851 F.Supp. 700, 700 n. 1 (D.Md.1994). Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,*

477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

### (ii)

The following account of material facts, drawn primarily from the Complaint, is set forth in the light most favorable to plaintiff, the nonmovant. Birch is "a person with a mental impairment that substantially limits a major life activity." Complaint, ¶ 9. On or about May 10, 1979, Birch began her employment with defendant in Baltimore. From that date through late September 2000, she held a variety of cleaning and operating jobs in different departments of Pepsi's Baltimore plant. In late September 2000, Birch began a new assignment as a sanitizer, which requires cleaning machines and equipment. On October 27, 2000, Birch injured herself on the job, allegedly due, in part, to Pepsi's "wanton and gross negligence." Specifically, Birch was injured while cleaning a turn table in the palletizer area of the plant. Birch entered the palletizer area and as she attempted to clean one of the five turn table machines, the machine energized and turned, catching Birch's upper leg between the turn table and the full pallet conveyor. Birch was caught in the machine for some period of time before her co-workers responded to her cries for help. As a result of her accident, Birch suffered post-traumatic stress disorder.

Birch requested modification of her job duties during her transition back to work after her accident. She alleges that defendant's representatives met with Birch and her counselor, Ms. Weber, on March 8, 2001, and orally agreed that, at first, Birch would help the support staff in the office doing a variety of clerical and related tasks. Then Birch would work in the production area, sweeping floors and getting used to the atmosphere of the plant but would not clean machines. Finally, Birch would work on the third shift as a sanitizer, cleaning the machines in the production department except those in the palletizer area. The parties agreed that this step-by-step plan would be implemented in accordance with Birch's health and progress in recovering from the trauma associated with her accident in the palletizer area. Defendant agreed that Birch would not lose her job.

On March 15, 2001, Birch returned to work to help the office staff with filing, copying, and to run errands. On or about May 1, 2001, Birch returned to the production area; there, she swept and cleaned the floors. On or about May 20, 2001, Birch returned to the third shift and performed her required duties, including

cleaning the machines in the production department, except those in the palletizer area.

On or about June 25, 2001, defendant insisted, as a condition of her continued employment, that she clean the machines in the palletizer area except for the particular turn table in which she had been injured. Birch had not recovered sufficiently from her injuries to comply with the assignment, and she repeatedly asked defendant to relieve her of that responsibility. Defendant denied Birch's requests. On or about July 6, 2001, Birch filed a grievance with Sean Cedenio, a representative of her union, Teamsters Local 570, asking that defendant allow her to work as a sanitizer and exempt her from working in the palletizer area because of her illness. Specifically, the grievance states: "The Company refused to allow me to work due to my present mental/physical condition which resulted from an on the job injury at Pepsi." *Decl. of Sean Cedenio* ¶ 4. To resolve the grievance, Birch asked defendant to "return me to work and pay me for all lost time. My present condition allows me to perform the major function of my job requirements. Please provide this reasonable accommodation to me." *Id.* ¶ 5. Defendant replied in the following manner: "This matter is currently being handled by the company's third party workers comp[ensation] agency and Jeanne Birch's attorney." *Id.* ¶ 6.

On July 17, 2001, Cedenio and Birch attended a meeting with David Wilson, Pepsi's Human Relations Manager. *Id.* ¶ 7. At the meeting, the company merely reiterated its position that the matter was being handled through its workers' compensation processes and refused to discuss it further. *Id.* Cedenio considered this response to be a denial of the grievance as defendant did not return Birch to her former position. *Id.* According to Birch, by

attending the meeting, which was held pursuant to step three of the grievance procedures in the collective bargaining agreement ("CBA"), Birch exhausted the CBA's grievance process. *Id.; Def.'s* Ex. A. at Article XIII § 3 (Collective Bargaining Agreement). After the grievance process was completed, Cedenio advised Birch that she had the option of pursuing her request for an accommodation with the Equal Employment Opportunity Commission. *Decl. of Sean Cedenio* ¶ 8. To date, although the parties refer to Pepsi as Birch's "former" employer, defendant has taken no formal action under the CBA or otherwise to demote, layoff, transfer, discharge, or relieve Birch from her employment. *Id.* ¶ 10.

*The Collective Bargaining Agreement*

Birch was a member of a collective bargaining unit represented by Local Union No. 570 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("Union"). The Union and defendant were parties to the CBA covering members of Birch's bargaining unit. *Decl. of David T. Wilson* ¶¶ 5–6 (Human Resources Manager). Various provisions of the CBA are relevant to Birch's claims against defendant. Article I, Section 1 recognizes the Union as the "sole collective bargaining agent with respect to hours, wages and other conditions of employment for all [covered] employees." *Def.'s* Ex. 1, at 4.

Article V acknowledges that defendant retains all normal and inherent rights to manage the company, including the right to "assign work to such employees in accordance with the requirements determined by management," "to make and enforce safety rules," "to transfer, promote or demote employees, or to lay off, terminate or otherwise relieve employees from duty for lack of work or other legitimate reasons," and to discharge employees in its

sole discretion, provided that the discharge is for just cause. *Id.* at 6–7. Article XXIV, Section 1 sets forth defendant's promise to "establish and maintain conditions of health and sanitation in conformity with all state and federal laws applicable to the plant." *Id.* at 23. Article V, Section 3, provides that when an employee's "physical and mental ability to perform his job assignment efficiently and safely is in question," defendant shall have the "right to promote, demote, lay off, or otherwise relieve said employee from work as a result of such evaluation, provided such action is not inconsistent with the terms and conditions of this Agreement." *Id.* at 7. Article V, Section 4, states that if an employee or the Union believes that discharge is unjustified, "either may file a grievance." *Id.*

Article XII, Section 1 and Article XIII, Section 1, set forth a detailed grievance-arbitration procedure resolving "all" employment-related disputes. *Id.* at 17, 19. According to Wilson, Birch did not exhaust those procedures before filing the instant action; rather, Birch only filed the first step of the grievance under the grievance-arbitration procedures on or about July 6, 2001. *Decl. of David T. Wilson* ¶¶ 7–8. Article XIII, Section 1 further states that "any grievance concerning the interpretation, application or alleged breach of any provision of the Agreement, that has been properly processed through the grievance procedure as set forth in Article XII and has not been settled at the conclusion thereof" may be referred to arbitration. *Def.'s* Ex. 1, at 5.

Finally, Articles XXIII and XXVII of the Agreement set forth the parties' agreement not to discriminate against employees with respect to any terms or conditions of employment on the basis of disability or any other basis prohibited by applicable law. *Id.* at 23, 25. Article XXII states that "the Company shall not participate in any act of discrimination prohibited by law." *Id.* at 23. Similarly, in Article XXVII "[b]oth parties acknowledge that neither will discriminate against any employee or applicant for employment because of race, color, religion, sex, age, veteran status, disability or national origin." *Id.* at 25–26.

(iii)

 Defendant first argues that the court lacks subject matter jurisdiction over Birch's claims because they are subject to mandatory arbitration under the PBG–Local 570 Collective Bargaining Agreement. Federal labor law favors arbitration of labor disputes. *See, e.g., Adkins v. Times–World Corp.,* 771 F.2d 829, 831 (4th Cir. 1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986) (explaining that it is clear that, "except for matters specifically excluded from arbitration, in the collective bargaining agreement, all questions on which the parties disagree must be submitted to arbitration" (citations omitted)). Moreover, it is clear that agreements to arbitrate ADA statutory claims are enforceable. *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 880–81 (4th Cir.) (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)), *cert. denied,* 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). "[A] valid agreement to arbitrate future disputes effectively ousts a court of jurisdiction." *Id.* at 878 n. 1 (citing *Big Vein Pocahontas Co. v. Browning,* 137 Va. 34, 120 S.E. 247 (1928); *Burks Pleading and Practice,* § 12 (4th ed.1952)).

The issue of whether Birch was required to arbitrate her ADA claim is governed by the "clear and unmistakable" waiver standard applied by the Supreme Court in *Wright v. Universal Maritime Service Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142

L.Ed.2d 361 (1998). In *Wright*, the Supreme Court set forth the test required to determine whether there has been a union-negotiated waiver of a judicial forum. The Court first explained that with CBA agreements "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Wright*, 525 U.S. at 78, 119 S.Ct. 391 (internal quotation marks omitted) (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). The Court then refined this principle by stating that the presumption does not apply to statutory discrimination claims. *Id.* at 78–79, 119 S.Ct. 391. Rather, CBA provisions calling for the arbitration of these claims must be "clear and unmistakable." *Id.* at 79, 142 L.Ed.2d 361 (quoting *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983)).

The CBA under scrutiny in *Wright* stated that it was "intended to cover all matters affecting wages, hours, and other terms and conditions of employment," "anything not contained in this Agreement shall not be construed as being part of this Agreement," and "it is the intention and purpose of all parties hereto that no provision or part of this Agreement shall be violative of any Federal or State Law." *Id.* at 81, 119 S.Ct. 391 (internal quotation marks omitted). The Court determined that none of these provisos satisfied the "clear and unmistakable" standard. *Id.* Accordingly, the Court held that "the collective-bargaining agreement did not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination." *Id.* at 82, 119 S.Ct. 391.

The Fourth Circuit, in *Carson v. Giant Food, Inc.*, 175 F.3d 325 (4th Cir.1999), explained that *Wright* "indicates that the requisite degree of clarity can be achieved by two different approaches." *Id.* at 331. The first

> simply involves drafting an explicit arbitration clause. Under this approach, the CBA must contain a clear and unmistakable provision under which the employees agree to submit to arbitration all federal causes of action arising out of their employment. Such a clear arbitration clause will suffice to bind the parties to arbitrate claims arising under a host of federal statutes, including '... the ADA.

*Id.* at 331–32. The second approach is employed when the arbitration clause is not as clear. For instance, general arbitration clauses "such as those referring to 'all disputes'" or "all disputes concerning the interpretation of the agreement," taken alone do not meet the clear and unmistakable requirement of *Wright*. *Id.* at 332. The Fourth Circuit elaborated:

> When the parties use such broad but nonspecific language in the arbitration clause, they must include an "explicit incorporation of statutory antidiscrimination requirements" elsewhere in the contract.... If another provision, like a nondiscrimination clause, makes it unmistakably clear that the discrimination statutes at issue are part of the agreement, employees will be bound to arbitrate their federal claims.

*Id.* The Fourth Circuit then determined that the CBA under scrutiny in that case failed both approaches as it contains a general clause and does not attempt to incorporate by reference federal statutory law. *Id.*

Defendant argues that Articles XXIII and XXVII of the Agreement satisfy the *Carson* requirements. Article XXIII, enti-

**382**

tled "No Discrimination," states: "No employee will be discriminated against with respect to hire, tenure or employment, opportunity for advancement, wages, hours of work, or any other term or condition of employment because of sex, race, color, creed or national origin. The Company shall not participate in any act of discrimination prohibited by law." *Def.'s Ex.* 1 at 23. Article XXVII, entitled "Applicable Law" states: "Both parties acknowledge their respective obligations under Title VII of the Civil Rights Act and agree that neither will discriminate against any employee or applicant for employment because of race, color, religion, sex, age, veteran status, disability or national origin." *Id.* at 25. The arbitration clause, Article XIII, states, in relevant part, that "[a]ny grievance concerning the interpretation, application or alleged breach of any provision of this Agreement, that has been properly processed through the grievance procedure as set forth in Article XII and has not been settled at the conclusion thereof, may be appealed to arbitration ...." *Id.* at 19. Article XII, entitled "Grievance Procedure," states, in relevant part: "The Union and the Company recognize their mutual responsibility for the prompt and orderly disposition of grievances of employees that arise under this Agreement. To this end, the Union, the employees and the Company agree that the provisions of this Article and Article XIII shall provide the means of settlement of all grievances of employees." *Id.* at 17.

The Fourth Circuit considered a case similar to this case in *Brown v. ABF Freight Systems,* 183 F.3d 319 (4th Cir. 1999). In *Brown,* the plaintiff, who suffered from diabetes, brought suit under the ADA after his employer informed him that it would no longer accept his bids for yard and dock jobs. *Brown,* 183 F.3d at 320. The defendant argued that the plaintiff was required to submit his ADA claim

to arbitration under the terms of the CBA. The CBA contained the following non-discrimination clause:

> The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, age, or national origin nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, age, or national origin or engage in any other discriminatory acts prohibited by law. This Article also covers employees with a qualified disability under the American with Disabilities Act.

*Id.* The "National Grievance Procedure" established the scope of the arbitral matters by stating that "[a]ll grievances or questions of interpretation arising under this National Master Freight Agreement or Supplemental Agreements thereto shall be processed as set forth below." *Id.* The district court held that the CBA clearly and unmistakably provided for arbitration of the plaintiff's ADA claim. The Fourth Circuit reversed. *Id.*

The Fourth Circuit first noted that the CBA did not survive under the first method identified in *Carson* as its arbitration clause was a standard one. The Court explained that such a standard provision "refers only to grievances arising under the Agreement, it cannot be read to require arbitration of those grievances arising out of alleged statutory violations." *Id.* at 321–22. The Fourth Circuit then went on to consider the second method and determined that the nondiscrimination clause, *supra,* does not make it unmistakably clear that it is incorporating federal statutory employment discrimination law. *Id.* at 322. The court stated that the nondiscrimination clause was not sufficient

to constitute a waiver, even though it "parallel[ed], or even parrot[ed], the language of federal antidiscrimination statutes and prohibit[ed] the some of the same conduct," because "none of those statutes is thereby explicitly incorporated into the agreement by reference otherwise." *Id.* The Fourth Circuit reasoned as follows: "As a result, the contractual rights the agreement creates 'cannot be said to be congruent with,' . . . those established by statute or common law, and an arbitrator in interpreting the scope of those rights pursuant to the general arbitration clause will be bound to interpret the explicit terms of the agreement rather than of any federal statutory antidiscrimination law." *Id.* (citation omitted).

The Fourth Circuit also rejected the employer's argument that the language in the agreement barring "any other discriminatory acts prohibited by law" amounted to an explicit incorporation of federal statutory rights. *Id.* The Court explained:

> There is a significant difference, and we believe a legally dispositive one, between an agreement not to commit discriminatory acts that are prohibited by law and an agreement to incorporate, in toto, the antidiscrimination statutes that prohibit those acts. We believe that where a party seeks to base its claim of waiver of the right to a federal forum on a claim of "explicit incorporation," . . . of the relevant federal antidiscrimination statute into the terms of the CBA, a simple agreement not to engage in acts violative of that statute (which, it bears noting, would be significantly more explicit than the vague reference to acts prohibited by "law" that we have before us) will not suffice. Rather, the parties must make "unmistakably clear" their intent to incorporate in their entirety the "discrimination statutes at issue . . . ."

*Id.* (citations omitted). Finally, *Brown* noted that the specific reference in the CBA to the ADA did not incorporate the requirements of the ADA, but merely added disability to the list of ways upon which parties agreed not to discriminate. *Id.* at 323 (citing *Wright*, 525 U.S. at 80, 119 S.Ct. 391, for the proposition that even a contractual requirement that the arbitrator "apply legal definitions derived from the ADA" is "not the same as making compliance with the ADA a contractual commitment that would be subject to the arbitration clause").

In the present case, the CBA provisions are substantially similar to those in *Brown*. As in *Brown*, the arbitration clause relied on by defendant is general and broad and thus fails under the first approach. Its requirement that "any grievance concerning the interpretation, application or alleged breach of any provision of this Agreement" may be arbitrated is virtually identical to the clause in *Brown*, which provides for arbitration of "all grievances of questions of interpretation arising under this . . . Agreement." As in *Brown*, defendant's arbitration clause "is insufficiently explicit to pass muster under" *Wright. Id.* at 321.

█ Consideration of the second approach yields the same result. The antidiscrimination clauses at issue here, although they may parallel federal law, together constitute merely an "agreement not to commit discriminatory acts," rather than an "agreement to incorporate, in toto, the anti-discrimination statutes that prohibit those acts." *Id.* at 322. The contractual references to "disability" merely add to the list of protected classes against which the parties agreed not to discriminate. *See id.* at 323. Further, the reference to "Title VII of the Civil Rights Act" in Article XXV of defendant's contract is not sufficiently explicit to waive Birch's

ADA claim. The contract does not identify the ADA in any way, and defendant cannot bootstrap the ADA into Title VII given that some of the ADA's substantive requirements are absent from Title VII. *Cf. Paris v. Dallas Airmotive, Inc.*, 130 F.Supp.2d 844, 847 (N.D.Tex.2001) ("Specific incorporation requires that the collective bargaining agreement identify the statute by name or citation." (citing *Rogers v. New York Univ.*, 220 F.3d 73, 76 (2d Cir.), *cert. denied*, 531 U.S. 1036, 121 S.Ct. 626, 148 L.Ed.2d 535 (2000); *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 631 (6th Cir.1999); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 9 (1st Cir.1999))).

Other jurisdictions that have considered provisions in CBA's similar to those advanced in the CBA presently in dispute have also rejected the contention of employers that arbitration is mandated. For instance, in *Rogers v. New York University, 220 F.3d 73* (2d Cir.), *cert. denied, 531 U.S. 1036, 121 S.Ct. 626, 148 L.Ed.2d 535* (2000), the Second Circuit rejected an employer's argument that a nondiscrimination clause in a CBA barred an employee from suing in federal court for discrimination under the ADA. The language in the CBA contained a non-discrimination provision that explicitly listed the ADA and a separate provision that required arbitration of disputes "concerning the interpretation, application, or claimed violation of a specific term or provision of this Agreement." *Rogers*, 220 F.3d at 76. The court determined that the arbitration clause was not sufficiently explicit to require submission of the ADA claim to arbitration, and neither the general arbitration clause nor the nondiscrimination provision "explicitly incorporated" the federal anti-discrimination statute, even though the ADA was specifically referenced in the CBA. *Id.; see also Bratten v. SSI Services, Inc.*, 185 F.3d 625, 630–32 (6th Cir.1999) (concluding that no waiver was effected on an ADA claim

through a non-discrimination clause, which prohibited discrimination based on the "presence of a disability or handicap" in conjunction with an arbitration clause providing that any complaints under the CBA were to be resolved in arbitration); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 8–9 (1st Cir.1999) (determining that the CBA did not require that employees submit all employment disputes to arbitration as the CBA did not explicitly mention employee rights under the ADA or any other federal anti-discrimination statute).

Defendant relies on *Safrit v. Cone Mills Corp.*, 248 F.3d 306 (4th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 122 S.Ct. 464, 151 L.Ed.2d 381 (2001). However, the facts of *Safrit* are easily distinguishable. In *Safrit*, a Title VII case, the CBA contained a single self-contained provision providing that the parties "agree that they will not discriminate against any employee with regard to race, ... [and] that they will abide by all the requirements of Title VII of the Civil Rights Act of 1964.... *Unresolved grievances arising under this Section are the proper subject for arbitration.*" *Safrit*, 248 F.3d at 307 (emphasis added). The CBA in the present case has nothing in common with the explicit waiver language of *Safrit*. Unlike *Safrit*, there is no clause incorporating all of the requirements of Title I of the ADA; nor is there an explicit clause requiring arbitration of Title I/ADA claims. Accordingly, defendant's reliance on *Safrit* is unavailing.

Defendant's fall-back argument, that the ADA claim must be arbitrated first under the CBA because Birch and her union initially brought and processed Birch's ADA accommodation claim as a grievance pursuant to the CBA's grievance and arbitration procedures, also lacks merit. Defendant relies on *Hightower v. GMRI, Inc.*, 272 F.3d 239 (4th Cir.2001), a Title VII case, in which the employer appealed

the district court's decision denying the employer's motion to compel arbitration. The district court had stated that it denied the motion "because there was conflicting evidence as to whether [the employee] assented to the" dispute resolution procedure. *Hightower*, 272 F.3d at 241. The Fourth Circuit reversed because the employee had acknowledged receipt of the dispute resolution procedure materials and remained employed after it became effective. *Id.* at 242–43. The present case does not involve a motion to compel arbitration and does not present the question of whether Birch acknowledged the receipt of the CBA materials and remained employed after it became effective. Moreover, *Hightower* does not involve the question of whether the court lacked subject matter jurisdiction to the hear the case based on a waiver. Accordingly, defendant's motion for summary judgment on this claim shall be denied.

### (iv)

Defendant next argues that Birch's state law claims are preempted by section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) ("the LMRA"). Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction over the parties . . . .

29 U.S.C. § 185(a). Thus, the LMRA provides the exclusive remedy for violation of contracts between an employer and a labor organization. *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987). This jurisdictional grant carries with it, as a matter of congressional intent, power in federal courts to fashion a body of federal common law for violation of labor contracts. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 449–52, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). "The preemptive force of section 301 is so powerful as to displace entirely any state claim based on a collective bargaining agreement . . . and any state claim whose outcome depends on analysis of the terms of the agreement." *Young*, 830 F.2d at 997 (citations omitted). The Fourth Circuit has explained that the LMRA intends that "doctrines of federal labor law uniformly to prevail over inconsistent local rules." *White v. National Steel Corp.*, 938 F.2d 474, 481 (4th Cir.) (internal quotation marks omitted) (quoting *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)), *cert. denied*, 502 U.S. 974, 112 S.Ct. 454, 116 L.Ed.2d 471 (1991). The Fourth Circuit further stated:

> The prospect that "individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." . . . Thus although state courts continue to have concurrent jurisdiction over breach of contract claims brought under § 301 . . ., they must apply federal law rather than state contract principles in interpreting the collective bargaining agreement and resolving the case. . . . The preemptive effect of § 301 is necessary "in order to ensure uniform interpretation of collective-bargaining agreements, and thus have to promote the peaceable, consistent resolution of labor-management disputes."

*Id.* (citations omitted).

"The preemptive reach of section 301, however, is by no means boundless. Section 301 preempts only state law claims that are 'substantially dependent on analysis of a collective bargaining agreement,' . . . not claims that only 'tangentially' in-

volve CBA provisions." *Fox v. Parker Hannifin Corporation*, 914 F.2d 795, 799 (6th Cir.1990) (quoting *Smith v. Evening News Ass'n*, 371 U.S. 195, 200–02, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962)) (citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). Moreover, individual contracts between an employer and an employee may coexist with a CBA; however, if the individual contract and the CBA are inconsistent, then the latter prevails. *Eitmann v. New Orleans Public Serv., Inc.*, 730 F.2d 359, 362 (5th Cir.) (citing *J.I. Case v. NLRB*, 321 U.S. 332, 337–39, 64 S.Ct. 576, 88 L.Ed. 762 (1944)), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984). "[I]ndividual contracts may not 'be used to ... limit or condition the terms of the collective agreement.... Individual contracts cannot subtract from collective ones....'" *Id.* (alterations in original) (quoting *J.I. Case*, 321 U.S. at 337–39, 64 S.Ct. 576).

Thus, where a plaintiff, covered by a collective bargaining agreement, asserts a state law claim, not independent of the CBA, the claim is preempted by section 301. *Fox*, 914 F.2d at 800; *McCormick v. AT & T Technologies, Inc.*, 934 F.2d 531, 535–35 (4th Cir.1991) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 813 (1992). The Sixth Circuit has held that "employees covered by a CBA cannot rely upon the existence of separate, individual employment contract giving rise to state law claims." *Fox*, 914 F.2d at 801; *see also Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1286 (9th Cir.1989) ("Since Chmiel's independent contract claim concerns a job position governed by the collective bargaining agreement, it is completely preempted by section 301." (citing *Young*, 830 F.2d at 997–99)). Because any "'independent

agreement of employment [concerning a job position covered by the CBA] could be effective only as part of the collective bargaining agreement,' the [CBA] controls and the contract claim is preempted." *Young*, 830 F.2d at 997 (first alteration in original) (citations omitted).

*Implied Duty not to Imperil*

■ Defendant first argues that Birch's argument that defendant breached its implied duty not to imperil Birch is preempted by the LMRA as the claim is not independent of the CBA. Birch responds that the CBA is not implicated because (1) Birch is not alleging that defendant violated a federal or state safety law within the contemplation of the CBA, and (2) Maryland substantive law, not the CBA, is the source of the duty alleged to have been violated here. Essentially, Birch is arguing that the implied duty arises from her relationship with her employer and not from the CBA. I agree with defendant for the following reasons.

LMRA preemption is not so narrow as to allow Birch to maintain her claim for breach of duty to provide a safe workplace simply because she does not explicitly rely on any provision of the CBA as the basis for the duty. *See Eitmann*, 730 F.2d at 363–63. It is first necessary to examine the elements of this state law cause of action to determine whether resolution of this state law claim requires interpretation of the CBA. *McCormick*, 934 F.2d at 535; *see Owen v. The Carpenters' District Council*, 161 F.3d 767, 774 (4th Cir.1998).

At common law, a master has an "implied obligation to treat the servant humanely, to employ him only in lawful pursuits, reasonably, and not to subject him to perils and dangers not ordinarily incident to the business." Stanley Mazaroff, MARYLAND EMPLOYMENT LAW § 3.01[2][b][ii], at 142 (2d 2001) (internal quotation marks

omitted) (quoting H. Wood, On The Law Of Master And Servant 165 (1886)). As Birch notes in her response, such an implied duty is part of the employment contract:

> Certain basic terms are legally implied *in all employment contracts,* and unless expressed to the contrary, they *form a part of the contract* as a matter of law. These terms, such as duty of loyalty,[1] are so deeply rooted in the common law of master and servant relationship that they are essential to the relationship and implicitly become part thereof. The duties which arise by implication of law are imposed on both employees and employers to create an underlying condition of trust in the relationship.

*Id.* § 3.01[2], at 132 (emphasis added). Notwithstanding the adoption of the Maryland Workmen's Compensation Act of 1914 ("MWCA"), Maryland courts have long recognized this common law obligation. *Id.* § 3.01[2][b], at 142–43; *see Athas v. Hill,* 300 Md. 133, 476 A.2d 710, 713 (1984) ("Notwithstanding the substitution of limited strict liability for tort liability with regard to conforming employers, we have continued to recognize that, at least in cases not covered by the workmen's compensation statute, an employer owes his employees a common law duty to provide a safe place to work."). For instance, the Court of Appeals of Maryland explained that the employer does not "warrant the safety of the servant's employment," but "undertakes only that he will take all reasonable precautions to protect the servant against accidents." *McVey v. Gerrald,* 172 Md. 595, 192 A. 789, 792 (1937). The

Court of Special Appeals of Maryland stated that "an employer has a general obligation to provide a safe workplace for his employees ..., aside from his obligations under the workmen's compensation act." *Beye v. The Bureau of National Affairs,* 59 Md.App. 642, 477 A.2d 1197, 1204 (1984), *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984).

Defendant's implied duty not to imperil Birch is clearly preempted by section 301. As explained, *supra,* this implied duty is part of the employment contract, in this instance the CBA, particularly as Birch does not contend that this duty arises from an independent employment contract. The duty exists because of the CBA, as it is the CBA that created the employment relationship and it is the sole employment contract. *Cf. Loewen Group International, Inc. v. Haberichter,* 863 F.Supp. 629, 634 (D.Ill.1994) (determining that the employee's claim that the employer violated its duty of loyalty and good faith was preempted by the LMRA because it arose from the collective bargaining agreement), *rev'd,* 65 F.3d 1417, 1422–23 (7th Cir.1995) (stating that this claim was not preempted as it arose from an independent employment contract, which clearly existed and the collective bargaining agreement ... did not create the employment relationship between the parties).

The extant case law shows that this result is not surprising. *See Pennsylvania Nurses Assn. v. Pennsylvania State Education Assn.,* 90 F.3d 797, 807 (3d Cir.1996) (noting that had the employee framed his complaint in terms of the em-

---

**1.** Other such implied duties include the employee's implied duty to refrain from insolent, offensive or threatening words or behavior, the employee's implied duty to exercise skill in performing duties, the employee's implied duty to protect an employer's trade secrets, employee's implied duty to regularly report

for work, the employer's duty to provide adequate compensation for services rendered, and the employer's implied covenant of good faith and fair dealing. Stanley Mazaroff, Maryland Employment Law § 3.01[2][a]-[b], at 133–45 (2d 2001).

ployer violating an implied duty in the CBA, the claim would have been preempted by the LMRA), *cert. denied,* 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997); *Person v. Bell Atlantic–Virginia, Inc.,* 993 F.Supp. 958, 961 (E.D.Va.1998) ("The Supreme Court has held that a Florida tort law claim alleging that plaintiff's union had breached its duty of care to provide a safe workplace is preempted by § 301." (citing *International Bhd. of Elec. Workers, AFL–CIO v. Hechler,* 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987))); *Fish v. Reliance Electric Co.,* 1994 WL 196425, at *3, No. 93–1481, 1994 U.S.App. LEXIS 11545, at *9 (7th Cir. 1994) (stating that the Supreme Court, in *Hechler,* 481 U.S. at 859–62, 107 S.Ct. 2161, "held that an employee's claim that her union had breached its duty to provide her with a safe workplace and to ensure that her duties were commensurate with her training and experience was preempted by § 301 of the LMRA because the duty invoked by the employee had no independent basis in state law apart from its creation by the terms of the collective bargaining agreement").

The Supreme Court's explanation of the nature of a collective bargaining agreement is instructive as it describes that its purpose is to lay out the rights and the duties of the parties:

"[t]he collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant....

It is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and em-

ployees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words."

*United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 579–80, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (internal quotation marks omitted) (citation omitted).

Indeed, the "implied duty" discussed here has been covered in the CBA. The CBA in the present case specifically addresses safety conditions: "The Company agrees to establish and maintain conditions of health and sanitation in conformity with all state and federal laws applicable to the plant." *Def.'s* Ex. 1 at 23. Article V, Section 2(j) acknowledges defendant's right "to make and enforce safety rules." *Id.* at 7. As addressed *supra,* the grievance procedure states that "the employees and the Company agree that the provisions of this Article and Article XIII shall provide the means of settlement of all grievances of employees." *Id.* at 17. *Cf. McCormick,* 934 F.2d at 536 (explaining that there is preemption, in part, because the CBA "es-

tablishes a grievance process to handle all employee disputes"). For the foregoing reasons, summary judgment is granted in favor of defendant on this claim.

■ Even if Birch's claim for breach of an implied contract to provide a safe workplace were not preempted by the LMRA, it would still be barred by the exclusive remedy provisions of the Maryland Workers' Compensation Act. This claim, whatever its source—contract or tort,[2] is preempted by the Maryland Workers' Compensation Act. *Collier v. Ram Partners, Inc.*, 159 F.Supp.2d 889, 902 (D.Md. 2001) (citing *Gladhill v. Chevy Chase Bank, F.S.B.*, No. 905 Sept. Term 2000, 2001 WL 894267 (Md.App. August 1, 2001); *Demby v. Preston Trucking Co.*, 961 F.Supp. 873, 881 (D.Md.1997)). Birch cites *Beye v. Bureau of National Affairs, supra*, in opposition. However, it is clear that this opinion indicates that "this common law obligation was covered by workmen's compensation." MARYLAND EMPLOY-MENT LAW § 3.01[2][b][ii], at 143 (citing *Beye*, 477 A.2d at 1204). Moreover, in *Athas v. Hill, supra*, the principal authority cited in *Beye*, the Court of Appeals of Maryland made clear that the common law duty to provide a safe workplace applies only in cases like *McVey v. Gerrald*, 172 Md. 595, 192 A. 789 (1937), that are not covered by Maryland Worker's Compensation Act. *Athas*, 476 A.2d at 713. Accordingly, summary judgment shall be granted in favor of defendant on Birch's claim of breach of duty not to imperil.

*Breach of the Oral Contract*

■ Birch alleges that defendant agreed to accommodate her disability through a transition plan with three phases; that such a plan was to be implemented in accordance with Birch's health and progress; and that defendant performed some aspects or terms of this agreement, but did not fully comply and ultimately breached this agreement with Birch. *Complaint* ¶¶ 26–30, 34–35, 49. Defendant contends that Birch's breach of an oral contract claim should be dismissed because (1) the claim is preempted by the LMRA and (2) if not, the contract created was "at will," which under Maryland law, can be terminated by the employer without liability. Birch argues that these contentions lack merit as Birch's claim is independent of the CBA and thus not preempted and the contract did not create an at-will employment. I agree with defendant that the claim is preempted by the LMRA. Accordingly, I do not reach the at-will employment argument.

Birch relies on *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), and *White v. National Steel Corp.*, 938 F.2d 474 (4th Cir.), *cert. denied*, 502 U.S. 974, 112 S.Ct. 454, 116 L.Ed.2d 471 (1991), to argue that this claim has not been preempted. However, these two cases involve individual contract claims brought by employees who left their bargaining units, and therefore the coverage of their collective bargaining agreements, to assume management positions. *Caterpillar, Inc.*, 482 U.S. at 388, 107 S.Ct. 2425; *White*, 938 F.2d at 478. The court in each case found those individual contracts to be independent of any collective bargaining agreement because they were negotiated while the employees were management employees, not while they were covered bargaining unit members. *Caterpillar, Inc.*, 482 U.S. at 395 & n. 9, 107 S.Ct. 2425; *White*, 938 F.2d at 477–78. The Fourth Circuit in *White* emphasized that the promises that the plaintiffs sought

---

**2.** The parties have disputed whether the claim for breach of the duty not to imperil should be characterized as a contract claim or a negligence claim.

to enforce in both *White* and *Caterpillar* were made during negotiations over the terms and conditions of their employment in management positions. *White,* 938 F.2d at 483; *see also Caterpillar, Inc.,* 482 U.S. at 395 n. 9, 107 S.Ct. 2425 (explaining that "respondents rely on contractual agreements made while they were in managerial or weekly salaried positions-agreements in which the collective-bargaining agreement played no part"). Similarly, in *Berda v. CBS, Inc.,* 881 F.2d 20, 26 (3d Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990), the individual contract was entered into prior to the commencement of plaintiff's employment with the defendant employer.

Unlike the plaintiffs in *White, Caterpillar,* and *Berda,* Birch was a bargaining unit employee covered by the CBA at all times relevant to her breach of contract claim. It is clear that Birch's individual employment contract claim is preempted by the LMRA as a matter of law. *See Fox v. Parker Hannifin Corp.,* 914 F.2d 795, 801 (6th Cir.1990) ("[T]he collective bargaining process prohibits [a bargaining unit employee] from engaging in separate negotiations with the company and precludes any actions to enforce such an agreement." (quoting *Maushund v. Earl C. Smith, Inc.,* 795 F.2d 589 (6th Cir.1986)) (second alteration in original)); *id.* ("[E]mployees covered by a CBA cannot rely upon the existence of a separate, individual employment contract giving rise to state law claims." (citing *Ulrich v. Goodyear Tire & Rubber Co.,* 884 F.2d 936, 938 (6th Cir.1989))); *see also Darden v. United States Steel Corp.,* 830 F.2d 1116, 1120 (11th Cir.1987) (stating that individual oral contracts of the bargaining unit members were preempted by the LMRA as the employees were covered by the CBA at the time); *Eitmann,* 730 F.2d at 364 (determining that section 301 preempts alleged oral agreement to keep bargaining unit

employee on the payroll at full compensation in the event of a disabling work-related injury); *Person,* 993 F.Supp. at 962 (E.D.Va.1998) (finding that the state law claim for breach of implied contract is preempted by the LMRA). As it is clear that the LMRA preempts the breach of contract claim, it is unnecessary to reach defendant's argument that if any independent contract was formed it was an at-will employment contract. Summary judgment shall be granted in favor of defendant on this claim.

(v)

An Order dismissing all claims except the ADA claim follows.

## ORDER

In accordance with the foregoing Memorandum, it is this 2nd day of May, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That the defendant's motion to dismiss or in the alternative for summary judgment is GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(2) That DEFENDANT SHALL FILE ITS ANSWER ON OR BEFORE MAY 20, 2002; and it is further ORDERED

(3) That the Clerk shall TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.